**DAUPHIN DEPOSIT TRUST COMPANY,**
Conway H. Olmsted, Henry C. Olmsted
and Spencer G. Nauman, Co-Executors
of the Estate of Gertrude McCormick,
Deceased, Plaintiffs,

v.

E. A. McGINNES, Defendant.

Civ. A. No. 6646.

United States District Court
M. D. Pennsylvania.

Aug. 24, 1962.

Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., Gene A. Castleberry, Attorneys, Department of Justice, Washington, D. C., Bernard J. Brown, U. S. Atty., Daniel R. Minnick, Asst. U. S. Atty., Scranton, Pa., for defendant.

FOLLMER, Chief Judge.

This is a suit for refund of Federal Estate taxes averred by the plaintiffs and denied by the defendant to have been erroneously or illegally assessed and collected.

The facts were stipulated, argument had, and briefs were submitted, from which the Court makes the following

## FINDINGS OF FACT

1. Gertrude McCormick died testate on January 24, 1953, a resident of Harrisburg, Pennsylvania.

2. Marlin Edgar Olmstead, former husband of the said Gertrude McCormick, died testate on July 19, 1913, a resident of Harrisburg, Pennsylvania.

3. The claim for refund asserted four items upon which deficiencies were assessed as being in error. One item is no longer in issue, the three items pertinent here are as follows:

"(1) The deficiency asserted and the interest thereon paid as a result of including within decedent's gross estate the value of a trust created under the Will of Marlin Edgar Olmsted of three-eighths of his residuary estate in which decedent had no interest, vested or contingent, in any portion of the remainder of said trust upon the prior death, intestate, of M. E. Olmsted, Jr., the remainder beneficiary of a one-fifth share thereof.

"(2) The deficiency asserted and the interest thereon paid as a result of including within decedent's gross estate the value of an inter vivos trust, known as the Jeannie C. Howard Trust, created by the decedent and in which she had reserved the right to alter, amend or revoke in conjunction with others, but which power was completely and effectively exhausted by decedent during her lifetime by execution of an instrument dated April 26, 1948, in which she altered the dispositive provisions of said trust; hence, at the date of death of the decedent she possessed no reserved powers.

"(3) The deficiency asserted and the interest thereon paid as a result of disallowing as a deduction expenses incurred by decedent's Executors incident to the sale of real estate owned by decedent, known as 'Cedar Cliff', which real estate was sold in proper exercise of the power to sell real estate conferred upon executors under Pennsylvania statutory law and not as agents for the heirs."

## AS TO ITEM NO. 1

4. Marlin Edgar Olmsted by his last Will and Testament as recorded in the Register's Office of Dauphin County, Pennsylvania, provided, inter alia, as follows:

"The rest, residue and remainder of my estate, real personal and

mixed, I give, devise and bequeath to my executors hereinafter named in trust, to manage and dispose of as herein directed, the said executors to have power to sell and convey any and all stocks and securities and any real estate not specifically devised herein, according to their best judgment whenever necessary or desirable and to reinvest the proceeds thereof, or any other funds, in other securities or in real estate, but except for the payment of the bequests above set forth, the estate is to remain intact until the twelfth day of June, Anno Domini, One Thousand, Nine Hundred and Thirty (A.D. 1930), upon which date, or as soon thereafter as possible, my executors shall set apart and retain whatever real estate or securities may seem to them necessary to yield sufficient income to insure and protect the payment of the annuities herein provided, and the remainder of the items comprising the estate shall be separately estimated and appriased (sic) and the whole divided into eight (8) equal parts or shares, one share to be allotted to each of my five children above named and be delivered over to them absolutely, or in the event of the death of any of them before the said date, then the share of such child or children so deceased shall be delivered to or divided among the lawful heir or heirs of the child or children so deceased. The remaining three (3) parts or shares, shall be retained by my said executors in trust and managed by them and the income thereof paid to my wife, Gertrude Howard Olmsted, so long as she shall live, and upon her death the said three parts or shares and the remainder of my estate, if any, after my executors shall have set apart and retained whatever real estate or securities may seem to them necessary to yield sufficient income to insure and protect the payment of any annuities herein provided and then remaining to be paid, shall again be separately estimated and appraised and shall be divided into five (5) equal shares, one share to be allotted to each of my five children above named and be delivered over to them absolutely, or in the event of the death in the meantime of any of them, then to the lawful heirs of the child or children so deceased, as above set forth. In the divisions above provided for, the parties entitled to receive parts of shares shall, if possible, agree among themselves as to which particular part or share each one shall have, but in the event of their failure so to agree, the distribution shall be made by lot."

5. Marlin Edgar Olmsted, the testator, died leaving a widow and the five named children to survive him; and his estate had a value in excess of $3,000,000.00.

6. Pursuant to the first dispositive provisions of said Trust (under the will of Marlin Edgar Olmsted) shortly after June 12, 1930 (which was the date upon which the youngest child attained her majority) distribution of five-eighths of the residuary estate in trust was made in equal shares to the five named children of testator who were then all living.

7. Three-eighths of the principal remained in trust for the benefit of Gertrude McCormick (formerly Gertrude Howard Olmsted) plaintiffs' decedent, for life, with remainder to be distributed upon her death in accordance with the second dispositive provision of the trust.

8. On February 8, 1931, Marlin E. Olmsted, Jr., died intestate, unmarried and without issue.

9. Upon the death of Gertrude McCormick, on January 24, 1953, Dauphin Deposit Trust Company, surviving successor trustee of the Trust created by Marlin Edgar Olmsted, deceased, made distribution of four-fifths of the remaining principal in the Trust in equal shares to Henry C. Olmsted, Conway H. Olmsted, Gertrude O. Nauman and Jane O. McMillan, in their own right as surviving children of Marlin Edgar Olmsted, deceased, and the remaining one-fifth

of said principal was paid in equal shares to said surviving children as the lawful heirs of Marlin E. Olmsted, Jr., deceased, as ascertained at the death of the life tenant.

10. No formal accounting of the administration of the Trust nor Petition for Distribution in the manner set forth above was presented to the Orphans' Court for approval; the same having been done with the approval and consent of and by releases from the four surviving children of Marlin Edgar Olmsted, deceased.

11. In the estate of Marlin Edgar Olmsted, deceased, there were unadministered assets and cash which had not passed to the trustees under the Will as to which Dauphin Deposit Trust Company as Administrator d. b. n. c. t. a., filed a First and Final Account showing a balance of $9,428.44 for distribution in accordance with a proposed schedule of distribution, in equal parts to the four said surviving children of Marlin Edgar Olmsted.

12. No exceptions having been filed, the said schedule of distribution was confirmed absolute on December 18, 1958.

13. It was the position of the Commissioner of Internal Revenue, in assessing part of the above referred to deficiency, that the deceased son, Marlin E. Olmsted, Jr., had such an interest in one-fifth of the property held in trust during the life of his mother, that the decedent as his heir inherited such property, so that one-fifth of the trust, valued at $779,284.99, should be included in decedent's gross estate.

14. The value of the aforesaid one-fifth interest in the property held in trust during the life of Gertrude McCormick, deceased, was $779,284.99.

## AS TO ITEM 2

15. On January 8, 1935 Gertrude McCormick, deceased, created an inter vivos trust wherein Dauphin Deposit Trust Company was named as Trustee to manage and invest the principal and pay the net income to her sister, Jane C. Howard, for life and upon her death to pay the net income to Mary Howard Shoup and Conway Robinson Howard equally for life and to the survivor with the remainder to be paid to the then living children of the settlor and to the issue of any deceased children.

16. Prior to April 26, 1948, Conway Robinson Howard died.

17. On April 26, 1948, decedent executed and delivered to the Trustee an instrument entitled "Amendment to Trust Agreement."

18. The defendant asserted the deficiency assessment, in part, on the grounds that the assets of the said trust, the value of which at time of decedent's death was $78,655.00, should be included in decedent's gross estate at its face value as of that time.

## AS TO ITEM 3

19. On or about October 28, 1953, nine parcels of real estate set forth as Item No. 4 of Schedule A of decedent's Estate Tax Return were sold by the Executors to William L. Murray and as part of said transaction the estate incurred and paid expenses in the amount of $194.66 for a survey of said properties to William Kerr Cowden and purchased State and Federal transfer stamps which were attached to the deed in the amount of $1,942.50.

20. The aforesaid expenses were claimed as administration expenses under Schedule J, Items 35 and 36 respectively, of decedent's Estate Tax Return and the same were disallowed as deductions by defendant.

## DISCUSSION

### AS TO ITEM NO. 1

Where the testator created a trust with a life estate in income for his wife and remainder to their five children or their heirs and where one child, intestate, unmarried and without issue, predeceased the life tenant, did the testator's wife as the heir of the child, acquire an interest in the remainder within the meaning of

Section 811(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 811(a)?

As to this portion of the claimed refund, the question is whether upon his death on February 8, 1931 the interest of Marlin E. Olmsted, Jr., in the undistributed three-eighths of the residuary estate vested in his mother, Gertrude Olmsted, the life tenant, as his heir at law, so as to be includable in her gross estate within the meaning of Section 811(a) of the Internal Revenue Code of 1939 which provides, inter alia:

> "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, * * *—
>
> "(a) Decedent's interest. To the extent of the interest therein of the decedent at the time of his death;".

■ In determining the interest of the decedent, Gertrude McCormick, recourse must be had to the will of Marlin Edgar Olmsted, decedent's first husband, to ascertain, if possible, the intent of Marlin Edgar Olmsted, the testator. As was stated in Burleigh Estate, 405 Pa. 373, 376, 175 A.2d 838, 839 (1961),

> "The pertinent principles of law are well settled; their application is sometimes difficult.
>
> "It is now hornbook law (1) that the testator's intent is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain: Dinkey's Estate, 403 Pa. 179, 168 A.2d 337; Pruner's Estate, 400 Pa. 629, 162 A.2d 626; Wanamaker's Estate, 399 Pa. 274,

159 A.2d 201; Hope's Estate, 398 Pa. 470, 159 A.2d 197." [1]

It is pertinent to note that the testator was an attorney of recognized ability who was thoroughly familiar with the legal terms used in the drafting of wills, Vandergrift Estate, 406 Pa. 14, 19, 177 A.2d 432 (1962); Burleigh Estate, 405 Pa. 373, 377, 175 A.2d 838 (1961).

" * * * the intent of the maker of this will must be ascertained by a consideration of the entire will, read in the light of the circumstances surrounding the maker when the will was made", but "interpretation is never to assume the proportions of reformation", Vandergrift Estate, 406 Pa. 14, 26–27, 177 A.2d 432, 438 (1962); Burleigh Estate, 405 Pa. 373, 175 A.2d 838.

■ In Dinkey Estate, 403 Pa. 179, 168 A.2d 337 (1961), cited by the plaintiffs, the will provided that upon the death of the life tenant the remainder was to be paid to testator's three children (naming them), but "In case of the death of any of my children prior to the distribution of the trust estate herein provided for I direct that his or her share be paid to his or her surviving children, * * *." On the death of Alva, Jr., one of testator's three children, during the pendency of the life estate, his widow claimed that Alva's one-third interest had vested absolutely on testator's death and accordingly she was entitled to participate. It was unnecessary for the court to consider the question of whether there was a vested remainder subject to divesting since the language of the will clearly showed testator's intent that the principal sum, upon the death of the life tenant, "should not go to a stranger to his blood." The Court there does point out that the intent must be gathered from the four corners of the will and that where there are two dispositive provisions, one cannot be read or considered without the other. That situation affords no comparison with the instant case. Similarly in Burleigh Estate, 405 Pa. 373, 175 A.2d 838 (1961), the

1. See also, Bald Estate, 385 Pa. 176, 122 A.2d 294 (1956).

intent was inferred in part from two paragraphs in which the testator used different words of gift and the Court said, "Testator did not specifically or clearly say when the gift to his 'brother and sister or their heirs' should vest, and therefore we must consider this language together with the other language of his will and the circumstances surrounding him when he made it."

The testator in the present case, however, used identical language in the several pertinent provisions of the will. Having directed the estate to be divided into eight parts, one share to be allotted to each of his five children (Marlin E. Olmsted, Jr., being one of the five) "above named and be delivered over to them absolutely, (on June 12, 1930, or as soon thereafter as possible) or in the event of the death of any of them before the said date, then the share of such child or children so deceased shall be delivered to or divided among the lawful heir or heirs of the child or children so deceased." In like manner as to the three parts or shares he continued same in trust with the income thereof to his "wife, Gertrude Howard Olmsted, so long as she shall live, and upon her death the said three parts or shares * * * shall be divided into five (5) equal shares, one share to be allotted to each of my five children above named and be delivered over to them absolutely, or in the event of the death in the meantime of any of them, then to the lawful heirs of the child or children so deceased."

 As was stated in Bald Estate, 385 Pa. 176, 182, 122 A.2d 294, 297, "an interest is to be construed as contingent only when it is impossible to construe it as vested" and "the intention to create a contingent interest 'should appear plainly, manifestly and indisputably'" and "the law leans to vested rather than to contingent estates, and the presumption is that a legacy is vested."[2] In Riverside Trust Company v. Twitchell et al., 342 Pa. 558, 564, 20 A.2d 768, 771,

the Supreme Court of Pennsylvania further points out, "The uncertainty which distinguishes a contingent remainder is not the uncertainty *whether* the remainderman will ever *enjoy* it, but the *uncertainty* whether there will be *a right* to such enjoyment", (Emphasis supplied) and "It is a well-settled rule, repeated in numerous cases * * * that the test in determining if an interest is vested or contingent is not the certainty or uncertainty of obtaining actual possession, nor the defeasibility or indefeasibility of the right of possession, inasmuch as estates may be vested in interest though without *present right* of possession. So long as *a present right* exists to a future possession the estate is vested, even though actual possession may be defeated by a future event." (Emphasis supplied)

It should be further noted that the "Pay and Divide" Rule which influenced some of the earlier cases has been abolished, Dickson Estate, 396 Pa. 371, 152 A.2d 680 (1959).

It is therefore clear, as to the first provision, each of the five named children of testator had a vested interest in a one-eighth interest, subject to its being divested if they did not survive the June 12, 1930 date, and had the son, Marlin E. Olmsted, Jr., died prior to June 12, 1930, his interest would have vested in his lawful heir and his mother (widow of the testator) being his sole lawful heir would have taken. Having in mind that Marlin died shortly thereafter on February 8, 1931, it is quite obvious that the surviving children of testator evidenced their understanding of the intent of their father by their consensual accounting and distribution to their mother as the sole heir of their deceased brother, Marlin. In this provision there was a right to future enjoyment on June 12, 1930, and in the second provision there was a right to enjoyment on the termination of a life estate. There is nothing here to indicate a different intent. The

---

2. See also, Brumbach Estate, 373 Pa. 302, 95 A.2d 514; Mikaloff Estate, 400 Pa. 140, 160 A.2d 703.

testator must have known that if any of his children died unmarried before testator's widow, she would be the "lawful heir" in whom the right would vest in either instance and if any other intent were involved on his part, could easily have used other language. It must be borne in mind that the will was executed on July 10, 1913 (testator dying July 19, 1913) and that at that time the youngest child was about four years old and the oldest not over seventeen and there was a possibility that the mother (testator's widow) might easily be (as she actually was in the case of Marlin E. Olmsted, Jr.) the sole lawful heir of all of the five children, if they predeceased her. Had testator intended to bar the widow as a "lawful heir" and (as plaintiffs contend) intended to limit the taking to issue of such children he could have and undoubtedly would have used such more restrictive term instead of "lawful heirs."

We need not speculate whether the trust would have terminated had all five children, unmarried, predeceased the mother [3] since as stated in 96 C.J.S. Wills § 955,

"There is no incongruity in a life tenant having a vested interest in a portion of the remainder, and an intention to defer vesting the remainder is not to be inferred because of the fact that the first taker is one of the class designated to take in remainder. The fact that the life tenant can never enjoy in possession the estate in remainder does not render it contingent. Thus, barring other contingencies, the estate in remainder may be vested in the life tenant where he answers the description of the testator's heirs or children. * * *"

That the law of Pennsylvania is in accord is substantiated by Thorne's Estate, 344 Pa. 503, 517, 25 A.2d 811, 818 (1942), wherein the Court stated:

"Thorne's interest in his father's estate was by the terms of the will

vested and not contingent. In Manderson v. Lukens, 23 Pa. 31, this court said: 'The question of vested or contingent is not to be tested by the certainty or uncertainty of obtaining the actual enjoyment; for that would make the character of the estate depend, not upon the terms of its creation, but on the form of the result. Neither does it depend upon the defeasibility or indefeasibility of the right of possession; for many estates are vested without possession, as well as with, which are yet defeasible. If there is a present right to a future possession, *though that right may be defeated by some future event, contingent or certain,* there is nevertheless a vested estate. An unpossessed estate is vested, if it is certain to take effect in possession, by enduring longer than the precedent estate.' * * *" (Emphasis supplied.)

■ Therefore, Marlin E. Olmsted, Jr.'s, interest in the undistributed three-eighths of the residuary estate vested in his mother as his heir at law and was includible in her gross estate.

■ Plaintiffs have sought to inject the matter of the submission to and approval by the Orphans' Court of Dauphin County of a First and Final Account of the Administrator d. b. n. c. t. a., covering a relatively small amount of unadministered assets.

We agree with the Court in Gallagher v. Smith, 3 Cir., 223 F.2d 218, 226 (1955), wherein it was stated,

" * * * We think the necessary conclusion is that whether the proceeding was adversary or nonadversary is not the test of conclusiveness in these cases but rather whether the judgment is an adjudication by the state court of a property right upon which solely the federal tax is imposed, which adjudication was and is final and binding upon the parties under the state law, and which was

---

3. But see Sharpless' Estate, 151 Pa. 214, 25 A. 44.

not obtained by collusion for the purpose of defeating the tax."

In this case the State Court made no findings on any of the matters before the Court in the instant proceedings.

## DISCUSSION
### AS TO ITEM NO. 2

Where the settlor created a voluntary, gratuitous, inter vivos trust and retained power to alter, amend, or revoke and where the settlor did make one amendment eliminating a secondary beneficiary, did the single amendment terminate the settlor's interest in the trust within the meaning of Section 811(d) of the Internal Revenue Code of 1939?

On January 8, 1935, Gertrude McCormick created an inter vivos trust wherein Dauphin Deposit Trust Company was named as Trustee to manage and invest the principal and pay the net income thereof to her sister, Jane C. Howard, for life and thereafter to her sister, Mary Howard Shoup, and her brother, Conway Robinson Howard, equally and to the survivor for life with remainder over to the then living children of settlor and issue of any deceased children. The trust provided, inter alia, as follows, to wit:

"*Third.* The Settlor reserves to herself the right to alter, amend or revoke this agreement either in whole or in part, provided however that said agreement shall not be revoked nor altered nor amended in such manner as to change the beneficiaries hereunder or the benefits to which they are respectively entitled without the consent of the said Jane C. Howard during her lifetime, and after the death of the said Jane C. Howard without the consent of Gertrude O. Nauman, daughter of the Settlor."

On April 26, 1948 (the brother, Conway Robinson Howard, having died) in accordance with the aforesaid power reserved, the settlor amended the trust as follows:

"WHEREAS, in the third paragraph of the said agreement, the said Settlor reserved to herself the right to alter and amend said agreement with the consent of Jeannie C. Howard in her lifetime;

"NOW IT IS HEREBY MUTUALLY UNDERSTOOD AND AGREED that sub-paragraph (b) of the first paragraph shall be amended to read as follows:

"(b) At the death of the said Jeannie C. Howard to thereupon distribute the principal of the fund, with all accretions, if any, and all unexpended income, among the then living children of the Settlor, and among the issue, if any, of any of her children who shall then be dead, such issue to take by representation the share or shares of such deceased child or children."

Jane C. Howard and Jeannie C. Howard were one and the same person.

Plaintiffs argue that this single exercise of the power of amendment exhausted the settlor's power to alter or amend the trust. Defendant, on the other hand, contends that the single amendment did not exhaust the power.

The Pennsylvania law on this matter, as I understand it to be, is well stated in Goodell's Estate, 53 Pa.Dist. & Co.R. 13, 24 (1945), as follows: "the right to modify or amend reserved in an inter vivos trust instrument may be repeatedly exercised as reserved, if there is no language in any part of the trust instrument which expressly or by necessary implication restricts the right to one exercise thereof."

In Huested Estate, 403 Pa. 185, 169 A.2d 57 (1961), the Court had to consider the effect of the successive amendments to an inter vivos trust on the statutory share the settlor's wife could receive at the settlor's death. The trust indenture contained the following clause:

"Article VIII The Donor shall have the right to amend the provisions of this agreement and to revoke the trust hereby created, in whole or in part, by delivering to the Trustee during his lifetime, a

**236**

signed instrument setting forth the amendment or revocation."

The trust was created in 1940. The settlor amended it five times, in 1940, 1944, 1946, 1951 and 1956. The Court stated, inter alia: "On each occasion the settlor, although he did not expressly revoke the dispositive provisions of the original trust indenture or its supplements, entirely rewrote all the dispositive provisions."

We cite this case not for any reason other than the fact that the Court accepted without reservation the propriety of settlor's power to amend his trust five separate times.[4]

Section 331, Restatement, Trusts, provides as follows:

"(1) The settlor has power to modify the trust if and to the extent that by the terms of the trust he reserved such a power."

The words "to the extent" would certainly seem to imply the possibility of a gradual modification necessitating multiple modifications or amendments. This, to my thinking, is certainly the law of Pennsylvania.

89 C.J.S. Trusts § 87 provides as follows:

"*Frequency of amendment.* Where the settlor of a deed of trust expressly reserves the right to modify or amend it, the right to amend may be repeatedly exercised if there is no language in the trust expressly or by necessary implication restricting the right to one exercise thereof. So, where the settlor reserves the power to modify the trust indenture 'from time to time,' as he may see fit, such power is not exhausted by its exercise five times. As used in a trust instrument providing for amendment of the trust by unanimous action of the settlor's family 'at any time,' the quoted phrase does not necessarily mean at any one time, but should be interpreted as

equivalent to 'from time to time,' where a construction limiting the amendment power to a single amendment would seem to fall far short of accomplishing the settlor's purpose."

Plaintiffs lean heavily on Hidell et al. v. Girard Life Insurance Annuity & Trust Co., C.C.E.D.Pa., 12 Fed.Cas. p. 122, No. 6,464 (1879), and Day v. Commissioner, 3 Cir., 92 F.2d 179 (1937).

In Goodell's Estate, 53 Pa.Dist. & Co.R. 13, 18 (1945), the Court disposed of Hidell and Day as follows:

"It must be conceded that the two circuit court cases, Hidell et ux. v. Girard Life Insurance, Annuity & Trust Co., supra, and Day et al. v. Commissioner of Internal Revenue, supra, cannot lightly be dismissed as inapposite. However, if the rule followed in these decisions is still to be accepted as good law, it should, in my opinion, be narrowly restricted to the exact factual situation of those cases."

I am in complete accord with that statement. Both Hidell and Day involved revocations by the grantor.

In Day the Court stated, "In the present case the creator revoked, ended, and extinguished all interest in the trust estate, and thereafter and at the date of his death he had no part or lot therein." The Court further quoted from the opinion in Hidell as follows: " 'where a power of revocation is once fully exercised, what is there left in the possessor of it, upon which a subsequent and entirely inconsistent exercise of it can rest?' "

The narrow one-amendment rule which plaintiffs insist is the law of Pennsylvania stems from the old English case of Hele v. Bond, Prec.Ch. 474, 24 Eng. Rep. 213 (1717). Of this case the Court in Goodell, supra, said: (53 Pa.Dist. & Co.R. page 18)

"There is nothing sacred in a principle of law merely because it

4. To the same effect see Schautz Trust, 395 Pa. 605, 151 A.2d 457 (1959); Chance's Estate, 29 Pa.Dist. & Co.R. 586

(1937); see also, Morton v. Commissioner of Internal Revenue, 7 Cir., 109 F.2d 47 (1940).

originated in antiquity. Hele v. Bond was decided in England in 1717, more than 50 years before our Revolution. Conditions existing with respect to the ownership of property have changed in many respects since that time, as much, in fact, as have means of transportation and communication. It can serve no good purpose today to perpetuate archaic rules of law, slavishly, in situations not contemplated when the rules were formulated."

Justice Qua of the Supreme Judicial Court of Massachusetts in State Street Trust Co. v. Crocker et al., 306 Mass. 257, 28 N.E.2d 5, 128 A.L.R. 1166 (1940), in referring to Hele, said:

"It may be doubted today whether the doctrine of that case as applied within the framework of a modern trust is not more likely to prove a pitfall than a convenience. But if it is the law, it plainly defeats the intention of the settlor or testator and is therefore so far opposed to the present trend that it ought not to be extended by analogy or otherwise to new situations not within its established scope."

■ I conclude that the settlor's single amendment in the instant case did not terminate settlor's interest in the trust within the meaning of Section 811 (d) of the Internal Revenue Code of 1939.

## DISCUSSION
## AS TO ITEM NO. 3

May coexecutors of an estate automatically deduct expenses of the sale of the testator's realty from the gross estate without a showing that the sale was reasonable and necessary to the proper administration of the estate?

Paragraph XIII of the last Will and Testament of Gertrude McCormick, Deceased, provided as follows:

"For the purpose of administering my said estate and executing the above trusts, I hereby authorize and empower my Executors hereinafter named, in their discretion, to sell any and all real estate and personal property which I may own at the time of my death, either at public or private sale, and to make, execute, acknowledge and deliver good and sufficient deeds or assurances of title therefor; free of all trust and limitations and without liability on the purchaser to see to the application of the purchase price. I hereby further authorize and empower my said Executors hereinafter named, in their discretion, to borrow money from such persons as they may desire including the power to borrow from themselves as individuals or as a fiduciary under any other trust agreement, to execute and renew promissory notes, and to pledge the assets of my estate as security therefor."

There can be no question but that the sales of the nine parcels of real estate on or about October 28, 1953 were made by decedent's Executors pursuant to the power and authority conferred upon them by the will of the said Testator.

■ Certainly an Executor's first concern should be a prompt and orderly liquidation of the estate in compliance with the terms of the will. This estate consisted of real property and personal property. Certain trusts were created and a complete distribution made of the estate. To say that a sale under such circumstances is not necessary but rather only for the benefit of the distributees is picayunish and does not make sense.

Section 812(b) and (2) of the Internal Revenue Code of 1939 provides in part as follows:

"For the purpose of the tax the value of the net estate shall be determined, * * * by deducting from the value of the gross estate—
* * * * * *
"(b) Expenses, losses, indebtedness, and taxes.—Such amounts—
* * * * * *
"(2) for administration expenses,
* * * * * *
"as are allowed by the laws of the

jurisdiction, whether within or without the United States, under which the estate is being administered, * * *."

Section 81.32 of Treasury Regulations 105 (1939 Code); Appendix, infra, states:

"The amounts deductible from the gross estate as 'administration expenses' are such expenses as are actually and necessarily incurred in the administration of the estate, * * *."

■ In Shaffer Estate, 360 Pa. 390, 61 A.2d 872 (1948), the Court held that commissions claimed by executors in connection with the sale of real estate under a power of sale were proper administration expenses. It would certainly seem that expenses to survey lands of a decedent incidental to the sale thereof and the necessary State and Federal transfer documentary stamps affixed to the deeds of conveyance should be equally necessary expenses to be incurred in the settlement of an estate.

Shaffer Estate, supra, further held, inter alia: "Other and more recent decisions confirm the correct rule to be that, even though a will does not effect an equitable conversion, a discretionary power of sale thereunder is sufficient to authorize the executor to convey the decedent's real estate: * * * there is a conclusive presumption that a general power of sale is for the payment of debts: * * *."

In Bartlett's Estate (Brown v. Smith), D.C.E.D.Pa., 153 F.Supp. 674, 678 (1957), the Court said:

"In Pennsylvania there is a conclusive presumption that a general power of sale in a will is for the payment of decedent's debts. From the exercise of such a power of sale arises the inference that the sale was for the purpose presumed by law. In re Shaffer's Estate, 1948, 360 Pa. 390, 61 A.2d 872. No evidence was here offered to overcome the inference. The expenses disallowed are such administration ex-penses as are allowed by the Commonwealth of Pennsylvania. The unchallenged inference is that the expenses are, as well, expenses of sales necessary to pay decedent's debts. Similar expenses were held to be deductible in Martha A. Allison Estate, 1946, 5 T.C.M. 992 and Estate of Louis Sternberger, 1952, 18 T.C. 836. The Commissioner erred in disallowing the deduction for these expenses. * * *."

The Commissioner erred in disallowing the deduction for these expenses.

Let Order be submitted.